IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

John G. Spirko, Jr.,                                       Case No. 3:95CV7209

         Petitioner

v.                                                         ORDER

Margaret Bradshaw, Warden,

         Respondent

This is a habeas corpus case in which this Court denied the petition. *Spirko v. Anderson*, 2000 WL 1278383 (N.D.Ohio), *aff' sub nom. Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004), *cert. denied sub. nom. Spirko v. Bradshaw*, U.S. , 125 S.Ct. 1699 (2005).

Presently pending is a motion by the petitioner, John G. Spirko, Jr., for relief from this Court's judgment denying his petition for relief and to reopen his habeas corpus proceeding.

The basis for the motion, which arises, alternatively, under Fed. R. Civ. P. 60(b) and as an independent claim for relief from a fraudulently-induced judgment, is the petitioner's contention that the respondent committed a fraud on this court during the course of the prior habeas proceedings, and that that fraud adversely affected the outcome of those proceedings.

For the reasons that follow, I find no fraud to have been committed. The petitioner's motion for relief from judgment shall, accordingly, be denied.[1]

---

[1] Petitioner has also moved for leave to file a surrpely, oral argument, an evidentiary hearing, and a stay of execution. His motion for leave to file a surreply shall be granted. His motions for oral argument and an

## Background

Spirko was convicted in the Van Wert, Ohio, Court of Common Pleas following trial before a jury of the August 9, 1982, for the abduction and murder of the Elgin, Ohio, Postmistress, Betty Jane Mottinger. The state courts affirmed his conviction and sentence of death.

Thereafter, petitioner filed his petition for a writ of habeas corpus. Following further proceedings in the state courts, during which period proceedings in this case were stayed, the petition for habeas relief was, as noted above, denied.

Among other claims made by the petitioner (and rejected by this court) in earlier proceedings in this case was his contention that the State had wrongly withheld information relating to the whereabouts and possible alibi of one Delaney Gibson.

It was the State's theory of the case that the petitioner and Gibson had committed the abduction and murder jointly. Principal support for its claim that Gibson was a co-participant came from the testimony of Opal Seibert, a witness who identified Gibson's photo from a twenty-four photo array. The witness had given a description of a person she had seen outside the Elgin Post Office at about the time of the crime; her description resulted in a sketch that the prosecutor was to argue was very similar to Gibson's photo. She identified Gibson at the petitioner's trial as the man she had seen outside the Elgin Post Office on the morning of the abduction.

---

evidentiary hearing shall be denied. The motion for a stay of execution shall be denied, without prejudice to the petitioner's right to renew that motion before the Sixth Circuit Court of Appeals on filing of his notice of appeal.

Prior to the trial, the petitioner's attorneys were on notice that pictures and other evidence may have existed that would have shown that on the Sunday evening before the murder (which occurred at about 8:30 a.m. on the following Monday morning), Gibson was in North Carolina. Petitioner's counsel were also informed about the identities of witnesses who likewise had told investigators that Gibson was in North Carolina the weekend before the crime in Elgin.

Petitioner's state court attorneys did not, however, have copies of those pictures, which, among other things, showed Gibson to have a full beard when they were taken. Nor did they have copies of documents (receipts and field hand "tickets" – Gibson was a migrant tomato picker) that would have supported the contention that Gibson was in North Carolina at least as late as fourteen hours before the kidnaping and killing of Postmistress Mottinger.

Gibson's name initially came to the attention of investigators when the petitioner mentioned it to Postal Inspector Paul Hartman after a series of interviews during which petitioner had indicated that various other persons had been involved in the Mottinger killing. Inspector Hartman was the principal federal investigator into the Mottinger killing, though he was not in overall charge of the investigation.

Hartman's interviews with Spirko began after Spirko, who was in state custody on assault charges at the time, told authorities that he had information about the robbery of the Elgin Post Office and homicide of the Postmistress.

During the course of his interviews with Inspector Hartman, Spirko provided details about the killing, Mrs. Mottinger, and other circumstances that had not been reported publicly. (*See* Doc. 218, Exh. D). This information included the number of stab wounds inflicted on the victim, a description of her

3

handbag, the color of her blouse, the canvas curtain in which her body had been wrapped and how it had been wrapped in the curtain, and that a stone had been pried from a ring on her hand.

At his trial, the petitioner claimed that Inspector Hartman had provided him with that otherwise unpublicized information. Petitioner also asserted in his testimony that he was innocent, and Gibson was the "real killer."[2]

The gravamen of the pending motion for relief from judgment is the fact that Inspector Hartman, who is now retired from the Postal Service, has made statements to several individuals, including Connie Mottinger (the present wife of the victim's husband), Bob Paynter (a Cleveland *Plain Dealer* reporter), and present counsel for the petitioner, that, prior to and at the time of the trial, he did not believe that Gibson was involved in the killing of Postmistress Mottinger.

In addition (though Hartman disputed this contention under oath at a deposition), he is alleged to have stated that before the trial he told the state court prosecutor, Stephen Keister, that he did not believe that Gibson was involved.[3]

---

[2]

In denying the petitioner's habeas petition, I concluded:

> In all likelihood, the petitioner testified in response to the need to explain his familiarity with details of the homicide that would have been known only to the murderer. This need to explain away his inculpatory and unique knowledge, rather than the state's failure to have produced additional information about Gibson's whereabouts or the photographs, led petitioner to testify in a way that he now implicitly asserts was false.

2000 WL 1278383 at *7.

[3]

Keister has also testified that Hartman did not express that view to him before the trial. For purposes of this opinion, I am assuming that Hartman did inform Keister that he did not believe Gibson was involved in the crime.

The petitioner contends that information about Hartman's disbelief in Gibson's involvement should have been disclosed during my review of his petition in general, and, in particular, with regard to petitioner's claim of *Brady* violations relating to Gibson's presence in North Carolina the evening before the crimes in Elgin.

The petitioner also contends that other information should have been made known to me while I was considering his habeas petition: 1) Hartman had developed additional evidence exculpatory of Gibson (namely, that he found no records of telephone contact between Gibson and the petitioner prior to the Mottinger kidnaping and murder, and he had not been able to connect keys found at the crime scene with Gibson); and 2) in 1995 Hartman had contacted Charles Kennedy, Keister's successor as Van Wert County Prosecutor, about the possibility of prosecuting one James Clark Kelley, who, according to the petitioner, Hartman strongly suspects was involved in the Mottinger murder along with Clark's girlfriend, Effie Rader.

In addition, the petitioner suggests that his motion for relief from judgment should be granted because: 1) while petitioner's appeal from the denial of his habeas petition was pending before the Sixth Circuit, Connie Mottinger called counsel for the respondent, Charles Wille, and told him that Hartman believed that Gibson had nothing to do with the Mottinger killing, and that Effie Rader and James Clark Kelley had been Spirko's accomplices; 2) Wille neither followed up on that information nor called it to the attention of the Court of Appeals before it issued its opinion affirming my denial of the petitioner's petition; 3) Wille later misled the Court of Appeals in response to questions during oral argument about why Gibson had not been prosecuted; 4) the State dismissed the indictment that had been pending against Gibson on the same day (but shortly before) the Sixth Circuit issued its affirmance; 5) the State had released Gibson

5

to Kentucky authorities, who tried and convicted him on non-capital charges (and he, in turn, has completed serving the ensuing sentence), and 6) Hartman's credibility has been undercut completely by variances between his statements to Connie Mottinger, Bob Paynter, and petitioner's counsel and various portions of his deposition testimony, which was taken in connection with the instant proceedings.

The petitioner argues that, either singly or in combination, the respondent's failure to have informed me about Hartman's disbelief in Gibson's involvement, his communication of that disbelief prior to trial to Keister, his discovery of additional evidence allegedly exculpatory of Gibson, and his approach to Kennedy about prosecuting Kelley constituted a fraud on this Court justifying relief from the judgment dismissing his petition.

**Discussion**

Rule 60(b) of the Federal Rules of Civil Procedure allows a party, including a habeas petitioner, to seek relief from final judgment and request reopening of his case on a showing of, *inter alia*, fraud, mistake, and newly discovered evidence. *Gonzalez v. Crosby*,   U.S.   , 125 S.Ct. 2641 (2005). To rely on Rule 60(b), and overcome the bar against a second or successive habeas petition, a habeas petitioner must allege "some defect in the integrity of the federal habeas proceedings," *id*. at   , 125 S.Ct. at 2648, which can include "[f]raud on the federal habeas court." *Id*. at   , 2648 n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2nd Cir. 2001)). To prevail on a demand for Rule 60(b) relief, a petitioner must "show extraordinary circumstances justifying the reopening of a final judgment." *Id*. at   , 125 S.Ct. at 2651. The Supreme Court has cautioned that "such circumstances rarely occur in the habeas context." *Id*. at   , 125 S.Ct. at 2649 (internal quotations and citations omitted).

6

To the extent that the petitioner brings his motion for relief from judgment under Rule 60(b), it is properly viewed as being brought under Rule 60(b)(3), which authorizes such relief where the judgment was procured by fraud. Rule 60(b) requires, however, that motions under subsection (3) be brought within one year. Because petitioner's motion was filed more than a year after entry of the judgment, he cannot rely on Rule 60(b)(3):

> As the district court pointed out, this motion was untimely, because the plain language of Rule 60(b) sets an absolute time limit on the motion of one year in addition to the requirement that the motion be filed within a reasonable time. Fed.R.Civ.P. 60(b). The district court therefore lacked the authority to grant relief.

*Thompson v. Bell*, 373 F.3d 688, 737 (6th Cir. 2004).

The petitioner's motion may, however, be treated as an independent action for relief from judgment on the basis of fraudulent misconduct. A habeas petitioner may bring such independent action alleging fraudulent misconduct before the federal court in cases of unusual and exceptional circumstances. *Buell v. Anderson*, 48 Fed.Appx. 491, 2002 WL 31119679, **8 (6th Cir.) (Unpublished Disposition). Such an independent action lies only to prevent "a grave miscarriage of justice." *Id*. at *498, 2002 WL 31119679 at **6 (citing *U.S. v. Beggerly*, 524 U.S. 38, 46-47 (1998)).[4]

The elements of such actionable fraud are:

---

[4] The court in *Buell* distinguishes between a motion seeking relief from judgment on the basis of fraud under Rule 60(b)(3) (and its one-year limitations period) and the alternative independent action at issue in that case, which is "an equitable remedy available in civil trials, including habeas proceedings which are conducted under civil rules of procedure. 48 Fed.Appx. at *498, 2002 WL 31119679, at **6). To conflate such independent action in equity with a motion seeking to vacate a judgment on the basis of fraud under Rule 60(b)(3) "would eviscerate the time-limits" of Rule 60(b). *Id*. The appellate standard of review of a trial court's ruling in such an independent action is abuse of discretion. *Id*. (citing *Barrett v. Secretary of Health & Human Services*, 840 F.2d 1259, 1263 (6th Cir.1987).

7

(1) conduct by an officer of the court (2) directed towards the judicial machinery itself that is (3) intentionally false, wilfully blind to the truth or is in reckless disregard for the truth and (4) a positive averment or concealment, when one is under a duty to disclose, and that (5) deceives the court. *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir.1993). " 'Fraud upon the court' has been narrowly defined to embrace: only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so the judicial machinery can not perform in the usual manner its impartial task of adjudging cases. It generally involves a deliberately planned and carefully executed scheme designed to subvert the integrity of the judicial process" *True v. Comm'r*, 999 F.2d 540 (6th Cir.1993) (unpublished) (internal citations omitted).

*Id*. at \*498, 2002 WL 31119679 at \*\*7

Applying this standard, I conclude that petitioner's allegations of fraud are not sufficient to justify, much less require granting his motion to vacate the judgment denying his habeas petition.

## 1. Conduct by an "Officer of the Court"

To prevail on his claim, the petitioner must show that the alleged fraud is attributable to an "officer of the court." An officer of the court is an agent through whom the court acts. *Cf. Tangwall v. Jablonski*, 111 Fed.Appx. 365, \*368, 2004 WL 2030028, \*\*3 (6th Cir.) (Unpublished disposition) (A "receiver is an officer of the court, an agent through whom the court acts.").

While serving as a Postal Inspector, Hartman was a member of the executive branch, not an officer of this or any other court. While this court had general supervisory jurisdiction over Hartman as a federal law enforcement officer, *see generally Smith v. Katzenbach* 351 F.2d 810, 816 (D.C. Cir.1965), the existence of such ancillary jurisdiction does not convert federal law enforcement officers into officers of the federal court.

The only officer of this court to whom misconduct is arguably attributed is one of respondent's counsel, Charles Wille. During the pendency of the petitioner's appeal from my order denying his petition

8

for habeas relief, Connie Mottinger called Mr. Wille and told him that "Delany Gibson, Paul Hartman claimed Delaney Gibson had nothing to do with it. Paul Hartman said it's Effie Rader and James Clark Kelley." (Mottinger Dep. at 88. l. 8-11).

In addition, Wille told the Court of Appeals, in response to questions from the bench, that he did not know why Gibson had not been prosecuted, though he suspected that the evidence may have been insufficient. Petitioner contends that this was an untrue response, because, according to him, the State had decided not to prosecute Gibson two or three years earlier.[5]

I find no fault, much less fraud on this court or the Court of Appeals, on Wille's part for his failure to have done anything following Mrs. Mottinger's call to him. The fact that Connie Mottinger told Mr. Wille in 2004 that Hartman stated that he then believed that two suspects (whose names had surfaced only after Spirko's state court trial) could not have alerted Mr. Wille to the possibility that Hartman had doubts about Gibson's involvement some twenty years earlier.

Likewise, I find nothing erroneous, much less improper, is Mr. Wille's response to the Court's questions. Indeed, his assumption that the evidence may have been insufficient appears to have been an accurate response, rather than false or misleading.

Certainly Mr. Wille's inaction following Connie Mottinger's call did not manifest anything that was "intentionally false, wilfully blind to the truth or [was] in reckless disregard for the truth" or constituted "a positive averment or concealment, when one is under a duty to disclose," as required under *Buell*.

---

[5] The petitioner does not, however, indicate how Mr. Wille might have come to know that fact, even if it is presumed to be true.

Nor did any inaction on Wille's part "deceive[] the court:" Hartman's belief, which, as noted, first developed after Spirko's trial, in the possible guilt of Rader and Kelley was reflected in the desk files reviewed by the undersigned *in camera* during the course of my adjudication of the petitioner's petition. Thus, that belief was not concealed from this court during the proceedings involving Spirko's habeas petition. Nor, as noted, did Wille's response during oral argument manifest deceitfulness or prevarication on his part.

Thus, there has been no misconduct during the course of the proceedings in this court and the Court of Appeals with reference to consideration of the petitioner's habeas corpus petition that involved a fraud on the court by an officer of the court.

On this basis, alone, the motion for relief from judgment can be overruled. In the interests of assuring the broadest possible review of the claims in the petitioner's motion, I shall, however, consider his other contentions.

### 2. Improper/Fraudulent Nondisclosure

The gravamen of Spirko's claim is that this court's consideration of the claims in his petition was adversely affected by the failure of the respondent to disclose the fact that, prior to the state court trial, Hartman had concluded that Gibson was not involved, and had communicated that conclusion to Keister, the prosecutor. Had I been aware of that circumstance, petitioner implicitly contends, I would have reached a different conclusion, particularly with regard to his *Brady* claim of improper nondisclosure of evidence relating to Gibson's whereabouts on the weekend before the killing.

There was, however, no improper nondisclosure on the respondent's part: neither the respondent nor her counsel, including Mr. Wille, had personal knowledge until more than four years, at the earliest, and

10

after entry of the judgment presently being challenged, about Hartman's disbelief in Gibson's involvement. One cannot be held accountable for failing to disclose information of which one is unaware.

Nor do I find that Keister – assuming, for the purposes of this proceeding, that Keister had learned from Hartman prior to the trial that Hartman did not believe Gibson to have been involved[6] – participated in a fraud on this court during the course of its review of Spirko's petition.

---

[6]

The petitioner contends that Keister's knowledge about Hartman's views is reflected in his failure to ask Hartman during direct examination about Gibson, though he had questioned Hartman about other suspects who Hartman had concluded were not involved.

The petitioner also contends that Keister's failure to question Hartman about his views as to Gibson's involvement was part of Keister's effort to conceal the evidence indicative of Gibson's presence in North Carolina on the eve of trial.

This argument has not previously been made in these proceedings, and technically should not be considered in this proceeding. I shall, nonetheless, consider it.

Even assuming, as petitioner alleges, that Keister deliberately did not ask Hartman about Gibson because he knew Hartman would opine that Gibson was not involved, Keister did not taint the integrity of the trial. Petitioner's state court defense counsel, who had been given the basic information that witnesses placed Gibson in North Carolina on the eve of the murder, and there were pictures to corroborate that evidence, could themselves have – but did not – question Hartman about Gibson on cross-examination. Any improper motive or other impropriety on Keister's part in declining to question Hartman about Gibson could have been, but was not remedied by defense counsel on cross-examination.

Why defense counsel did not cross-examine Hartman about evidence placing Gibson in North Carolina the evening before the murder is, moreover, entirely understandable. Such evidence would have undercut substantially Spirko's "Gibson was the real killer" defense.

Letting the jury know that Gibson was several hundred miles from Elgin, Ohio, fourteen hours before the crime (and that he was bearded, as the pictures would have shown) would have increased significantly the likelihood that the jury would disbelieve Spirko's testimony.

Thus, to the extent that information about Gibson's whereabouts was kept from the jury, it remained undisclosed due to strategic decisions on the part of defense counsel, rather than misconduct on the part of the prosecution.

11

As to the habeas proceeding, Keister – like Hartman – was not an officer of this court. He was, at most, a witness, who had no affirmative duty to disclose the basis for his theory of the case or why he presented the evidence he did. Keister committed no fraud on this court, or vis-a-vis these proceedings.

It was Keister's job, not Hartman's, to develop and present the State's theory of the case. The views, no matter how strongly held, of any law enforcement officer as to guilt or innocence do not trump a prosecutor's determination of whom to prosecute, and how to present the prosecution's case. A prosecutor is under no duty to tell either the court, the jury, or defense counsel about the views of investigators and law enforcement agents about the strengths and weaknesses of his case.[7]

I find no improper, much less fraudulent failure on the part of the respondent to have learned what Keister knew about Hartman's views at the time of trial, or not to have disclosed those views to this court.

---

[7]

As a general rule, moreover, a prosecutor's exercise of discretion is not cognizable in a habeas proceeding. *See Latu v. Ashcroft,* 375 F.3d 1012, 1019 (10th Cir. 2004).

To be sure, a prosecutor cannot under *Brady* affirmatively sequester and conceal evidence bearing on an accused's guilt or innocence. Hartman's opinion about Gibson's innocence was not, however, evidence, and would not have been admissible even if known to the defense and offered by it or in its case. *See, e.g., United States v. Bess,* 593 F.2d 749, 755 (6th Cir.1979) ( "expressions of personal belief of innocence or guilt of an accused are error" ).

Had the issue of Hartman's nondisclosure of his belief that Gibson had nothing to do with the kidnaping and murder been before me when I considered petitioner's habeas petition, it would not have altered the result reached by me. Even if there were some duty that arose under the federal Constitution to disclose that information to defense counsel, its non-disclosure was did not materially affect the outcome.

Spirko had to explain away his knowledge of facts that were not publicly known. To do so, he attributed that knowledge to Gibson, on the one hand, and Hartman, on the other. Keeping Gibson in the case was as much in his interest as it was in the State's interest. As already noted, Spirko's attorneys had no reason to question Hartman about Gibson's culpability, or ascertain what his views were about Gibson's involvement. On the contrary, they had every reason to stay away from that line of inquiry.

I likewise find nothing improper, much less fraudulent, in Keister's failure not to have come forward *sua sponte* during the course of the earlier proceedings and notified respondent's counsel and/or this court about those views.

### 3. Nondisclosure of Other Evidence or Information

The petitioner contends that the respondent committed fraud when she did not call my attention to additional evidence allegedly bearing on Gibson's whereabouts shortly before the crime. According to the petitioner, I should have been apprised that Hartman had: 1) conducted a review of telephone records and been unable to verify any contact between Spirko and Gibson during the period preceding the crime; and 2) conclusively determined that keys found at the crime scene, and believed by Hartman to have been dropped by one of the participants in the abduction and murder, had no connection to Gibson.

The existence of this evidence – which, in petitioner's view, further exculpates Gibson – should, the petitioner contends, have been disclosed to and considered by me in the course of deciding the petitioner's petition. Had I been aware of that evidence, petitioner implicitly asserts, I would have concluded that a prejudicial *Brady* violation had occurred, and required granting the petition.

Concealment of that information – if such can be deemed to have occurred – did not affect the outcome in the habeas proceedings before me for at least two reasons.

First: this information has no bearing on Gibson's involvement. The fact that phone records did not disclose contact does not prove that there was no contact via other phones. No contact over one or more sets of phones is not proof that there was no contact over other sets of phones.

Similarly, the fact that keys believed to have been dropped by one of the criminals did not have a connection with Gibson is likewise not proof that he was not at the scene.

13

These negative results prove nothing, or at least nothing of which the jury was unaware: namely, that there was no tangible or forensic proof connecting either Gibson or Spirko to the crime. As to Gibson, there was Opal Seibert's eyewitness identification of Gibson (which defense counsel was able to challenge to whatever extent they thought it advisable to do so); as to Spirko, there were his inculpatory statements, his knowledge of information not publicly available, and the jury's assessment of his credibility as a witness.

It was clear to the jury that there was no direct forensic proof, such as fingerprints, connecting Gibson or Spirko to the crime scene. Evidence that there were no phone records of pre-crime contacts between Gibson and Spirko and that keys found at the scene could not be connected to either would have added nothing to the fact, already clear to the jury, that there was no forensic proof of their culpability.

Thus, engaging in the somewhat dubious assumption that I can presently consider the merits of the petitioner's contentions about the additional allegedly undisclosed evidence exculpatory of Gibson, my unawareness about the phone record search and crime scene keys did not affect the outcome of my review of the merits of the petitioner's petition.

The petitioner also contends that I should have been made aware of the fact that Hartman had approached Kennedy, Keister's successor as County Prosecutor, seeking to have Kennedy institute proceedings against Rader and Kelley.[8]

---

[8]

I note that the materials before and reviewed by me during my adjudication of the merits of the petition indicated that, at some point following the petitioner's state court trial, Hartman had concluded that Rader and Kelley had participated in the abduction and murder with Spirko. (*See* Doc. 213, Exh. B). What was not disclosed to me, or known to the respondent and her counsel, was that Hartman had concluded that Gibson was not involved prior to Spirko's trial, and, for purposes of these proceedings, should be deemed to have communicated that information to Keister before the trial.

14

There has been no showing of knowledge on the part of respondent or her counsel about this contact and request. Thus, there was no misconduct by an officer of this court involved in its nondisclosure during the earlier proceedings.

Information about this contact, and Kennedy's decision not to pursue that suggestion, would, in any event, have had no bearing on my decision. At most, that information gives additional support to the petitioner's contention that the state authorities were aware of Hartman's belief that Gibson was not involved. But, as already noted, nondisclosure of that belief – either to this court or the state court judge, jury, and defense counsel – is neither a ground for relief in the instant proceeding nor would have been a basis for relief, had its merits been before me when I was considering the petitioner's petition.

The other events and circumstances described and discussed in the petitioner's brief in opposition to the respondent's motion for summary judgment have no bearing on his request for relief from judgment, as they all occurred after adjudication of the merits of the petition.

Dismissal of the indictment against Gibson happened – coincidentally – on the same day that the Sixth Circuit later issued its affirmance of my decision. No one could have forecast this event, which, in any event, has no indicia of fraud or other misconduct. It simply represents Kennedy's determination that the State did not have a sufficient likelihood of proving Gibson's involvement beyond a reasonable doubt.[9]

---

[9]

Though not properly before me in this proceeding, it was not necessary for Keister to have believed that the State could prove Gibson guilty beyond a reasonable doubt for him, without violating the petitioner's right to due process, to contend that Gibson participated in the abduction and murder of Mrs. Mottinger.

An eyewitness put a clean-shaven Gibson at the scene; other evidence put a bearded Gibson hundreds of miles away fourteen hours earlier. The fact that a reasonable prosecutor –- be it Keister (or Kennedy) –- would conclude that he was unlikely to prevail at trial against Gibson did not cause the petitioner's constitutional rights to be violated when Keister presented evidence of Gibson's involvement and connected

15

The fact that the State in due course released Gibson to the State of Kentucky, where he was tried, convicted, served his sentence, and was released, is likewise immaterial in this Rule 60(b) proceeding. Even if the respondent were aware of these events, to the extent that they were occurring during my consideration of the merits of the petitioner's petition, there was no obligation to inform me of them. In any event, I detect no fraud or other misconduct in the failure to have done so.

### 3. Hartman's Veracity

Petitioner's remaining ground for relief from judgment is his contention that "all of Hartman's testimony must be viewed very differently in light of what we now know of his credibility." (Doc. 216 at 66).

To the extent that Spirko seeks in this proceeding to obtain relief on the basis that Hartman testified falsely at his trial, he cannot do so. As previously discussed, his present challenge can reach only so far as the proceedings leading to denial of his habeas petition. *Buell, supra*. That challenge cannot extend beyond those limits and become a free-wheeling inquiry into the constitutionality of his underlying conviction– which is what his claim about Hartman's veracity attempts to become.

In any event, the petitioner points to no specific portion of Hartman's trial testimony that he claims was false. Instead, he makes a general assertions that "it is fair to ask whether any of [Hartman's] trial testimony can be relied upon to permit Spirko's death sentence to stand." (*Id*. at 67) and "Hartman deceived the jury at trial. . . ." (Doc. 219 at 4).

---

that involvement to Spirko's pretrial statements about Gibson's participation to try to convince the jury beyond a reasonable doubt of Spirko's guilt.

16

Spirko bases his claims about Hartman's lack of truthfulness on the fact that Hartman has given deposition testimony that was admittedly inconsistent with his statements to Connie Mottinger, Bob Paynter, and petitioner's present counsel. He cannot, however, work backwards from those inconsistent statements to a finding of fraudulent misconduct during the earlier proceedings in this court or impugn the jury's verdict (which necessarily involved an assessment of Spirko's credibility as well as that of Hartman and the other witnesses).

Thus, whatever aspersions or doubts may be cast on Hartman's truthfulness as a witness in view of his statements in 2004 and 2005 that he did not believe Gibson was involved, cannot be a basis for relief from a judgment entered in 2000.

## Conclusion

For the foregoing reasons, I find that no fraud was committed on this court by an officer of this court or otherwise during the course of my review and adjudication of the petitioner's habeas corpus petition.

It is, accordingly,

ORDERED THAT

1. Petitioner's motions for oral argument and an evidentiary hearing are denied; and petitioner's motion for a stay of execution be, and the same hereby is denied, without prejudice, and

2. Petitioner's motion for relief from judgment is denied.

So ordered.

s/James G. Carr  
James G. Carr  
Chief Judge