IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

John G. Spirko, Jr.,                              Case No. 3:95CV7209

       Plaintiff

   v.                                                  ORDER

Margaret Bradshaw, Warden,

       Defendant

       This is a capital habeas corpus case under 28 U.S.C. § 2254 by a state prisoner convicted of the 1982 murder of Betty Jane Mottinger, Postmistress of the Elgin, Ohio, Post Office.

       This court denied the petition, the Sixth Circuit affirmed, and the Supreme Court denied certiorari. *Spirko v. Anderson*, 2000 WL 1278383 (N.D.Ohio), *aff' sub nom. Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004), *cert. denied sub. nom. Spirko v. Bradshaw*, U.S. , 125 S.Ct. 1699 (2005).

       Thereafter, the petitioner filed a motion under Fed. R. Civ. P. 60(b) for relief from judgment, in which he contended that the respondent committed a fraud on this court during the course of the prior habeas proceedings, and that that fraud adversely affected the outcome of those proceedings. That motion was denied. *Spriko v. Bradshaw*, 2005 WL 2174000 (N.D.Ohio Sept. 6, 2005).

       Thereafter, the petitioner appealed the denial of his Rule 60(b) motion to the Sixth Circuit Court of Appeals.

       While that appeal was pending, the parties became aware of letters sent by U.S. Postal Inspector Gregory A. Duerr on August 22, 2005, to Ohio Governor Bob Taft (Doc. 235-4 [Taft Letter]) and August 31, 2005, to Chief Postal Inspector Leroy Heath. (Doc. 233-3 [Heath Letter]).

Those letters alleged, *inter alia*, that "it appears an individual who did not commit the crime is going to be executed" (Heath Letter at 1), "Spirko's conviction is based on the lies and omissions" of the lead investigator of the Mottinger abduction and killing, Postal Inspector Paul Hartman. (Taft Letter at 1), and "almost every inspector familiar with inspector Hartman and the issues in this case, have concerns that a tragic injustice will take place if Mr. Spirko is executed. . . ." (*Id.*).

The Duerr letters also asserted that "most, if not all inspectors in Cleveland have concerns about what is transpiring" (Heath Letter at 2) and he "and other inspectors in the Cleveland Field Office [] have questioned whether our agency was making aggressive attempts to ensure justice is the ultimate outcome in this situation." (Taft Letter at 1).

In support of his contentions, Inspector Duerr alluded to his "knowledge of the character of [Paul Hartman] the inspector responsible for the [Spirko] investigation" (Heath Letter at 2) and Hartman's "history with the agency that lends a significant amount of credibility to the issues raised by Mr. Spirko's attorneys" (Taft Letter at 1).

Inspector Duerr stated that he had "witnessed unprofessional comments and in some instances, conduct bordering on criminal" on Hartman's part. (Heath Letter at 1). Inspector Duerr further reported that concerns with Hartman's conduct and character had led to a meeting in 1998 between approximately fifteen Inspectors with the Inspector in Charge of the Cleveland office.[1] Shortly after that meeting, according to Duerr, "Inspector Hartman resigned sooner than he wanted." (Heath Letter at 1).

---

[1] As discussed below, the meeting to which Duerr referred occurred on January 3, 2000, rather than in 1998, and involved nine, rather than fifteen Inspectors. These mistakes are immaterial.

Inspector Duerr's letters also referenced articles in the Cleveland Plain Dealer that had appeared earlier in 2005, which expressed concerns about Spirko's conviction. (Heath Letter at 1; Taft Letter at 1).

In light of the allegations in the Duerr letters the petitioner asked the Sixth Circuit to remand for this court for further proceedings before the undersigned. The Sixth Circuit remanded for consideration of petitioner's motion to vacate my decision denying his Rule 60(b) motion and for a limited reopening of discovery. *Spirko v. Bradshaw*, No. 05-4130 (Order, September 22, 2005).

On October 17, 2005, I ordered the U.S. Postal Service to produce records forthwith for *in camera ex parte* inspection relating to: 1) a meeting held on January 3, 2000, relating to allegations of misconduct attributed to Inspector Hartman by several other Postal Inspectors; 2) complaints about an improper relationship involving Inspector Hartman and an employee of that office; and 3) discipline, if any, of Inspector Hartman.

These records have been received and reviewed *in camera*.

Petitioner contends that Hartman lied during a deposition when he was asked whether, during his tenure as a Postal Inspector, he was ever the subject of any complaint. In response to this inquiry, Hartman stated, "To the best of my knowledge, I never had a complaint. I was the subject of one Internal Affairs investigation, and that is when I shot a suspect in May of 1993." (Doc. 233, Exh. A, at 34 [Deposition of Paul Hartman]). This, according to Hartman, was a routine investigation undertaken whenever an Inspector has been involved in a shooting. (*Id.*).

The petitioner claims that the Duerr letters indicate that Hartman's response was false, and that he had been the subject of complaints about his conduct. Such falsity, the petitioner contends,

3

justifies further discovery about Hartman and his veracity, vacation of the Rule 60(b) decision, and reopening of the habeas corpus proceedings.

Pending is the petitioner's Motion for Leave to Conduct Supplemental Discovery (Doc. 233) pursuant to the remand order.

For the reasons that follow, I find no basis for concluding that former Inspector Hartman's response was untruthful, or that he lied when he made that response. The Motion for Leave to Conduct Supplemental Discovery shall, accordingly, be denied.

## Discussion

### 1. The Duerr Allegations

#### a. Duerr's Deposition

The petitioner has deposed Inspector Duerr, who has been a Postal Inspector since 1984. (Tr. 21). In 1993 he was transferred to the Cleveland office. For several years he was permitted to work out of the Canton, Ohio, post office. He was assigned to the fraud unit, though as of October 1, 2005, he has been transferred back to the Cleveland office and assigned to the external crimes unit.

After Inspector Duerr was assigned to the Cleveland office in 1993, Hartman was his supervisor for about a year. Their relationship, at least from Inspector's Duerr's viewpoint, was not cordial: in Duerr's words, Hartman was "messing with me" (Tr. 45) and "[t]here was a constant tension on the team regarding how Paul operated as a supervisor, and even just the way he went about conducting his investigations." (Tr. 46-47). In addition, another inspector told Inspector Duerr that Hartman considered Duerr to be a suspect in a series of postal robberies that had begun shortly after Duerr had arrived in the Cleveland office. (Tr. 47-48).

With specific reference to his allegation in the Heath Letter that Hartman had engaged in "borderline criminal" conduct, Inspector Duerr gave six examples during his deposition.

The first involved a stake-out of a drug store that had a postal facility that had been robbed. Hartman instructed Duerr and other inspectors to seize individuals coming out of the store and "prone" them (i.e., place them on the ground), even though there was no probable cause to seize or arrest such individuals. Duerr and the others did not obey this directive. (Tr. 49-51, 88).

The second, which Inspector Duerr had not witnessed, involved a suspect who had been handcuffed to a chair, apparently during an interrogation. (Tr. 53).

The third, likewise not observed first-hand by Inspector Duerr, involved an instruction by Hartman to another Inspector to include false information in a search warrant affidavit. The other inspector disregarded Hartman's directive. (Tr. 55-56, 88).

Inspector Duerr's fourth example of allegedly borderline criminal conduct was that another agent

> has told me, and he may be speculating because of the way he laid it out, something to do with some search warrant or two search warrants, seems to me something to do in the downtown area and something at a mall that he felt that Paul may have lied on. What he based that on, I have no clue.

(Tr. 57).

The fifth example was that Inspector Hartman, in discussing interrogation, would "make the comment on occasion that if his mouth moves, he did it, something to that effect." (Tr. 62).

The sixth was a statement by Inspector Hartman, who had once shot a suspect, that he "wanted to be the first person [i.e. Postal Inspector] to shoot two people." (Tr. 87).[2]

---

[2] Inspector Duerr testified that a Cleveland Police Detective, whose name he could not remember, had offered to provide him with details about the shooting in which Inspector Hartman had been

5

With regard to the contention that his concerns were shared by others in the Cleveland office, Duerr acknowledged that one of his colleagues, Inspector Bogden, "felt it was in the courts and I shouldn't be raising the question." (Tr. 59). Inspector Conner

> [p]ulled me aside and was trying to reassure me, hey, I don't know if you're aware, I got the case from Paul, and I've had a chance to look through the case and review what was in the files and whatever, so I'm pretty knowledgeable of what's going on. His words to me were, in trying to reassure me, he said, I'm pretty sure we got the right guy.

(Tr. 61).

When asked about others who shared his concerns, Duerr stated, in addition to Inspector Conner, Inspectors Bob Gatz and Joe Long (Tr. 81), Postal Service Attorney Michael Rae, Dale Kamps, Emerson Samuals, Frank Piheker, Rob Dodyk, Pete Drodoofsky, John Wascak" and others whom he couldn't recall. (Tr. 82). While Wascak, Samuals, and Long may have been involved in the investigation of the Mottinger murder, Duerr did not know the level of their involvement. (Tr. 135).

Inspector Duerr did not relate any conversations with any of those individuals, and he did not otherwise provide any specifics about their concerns. When asked about discussions with Wascak, Daniel Bonda (who also appears to have been involved in the investigation), and Long, Duerr acknowledged that "they never indicated to [him] anything, or any statements at all as to problems in the actual investigation.  .  .  ." (Tr. 136).

---

involved. According to Duerr, the Detective "said something to the effect, I was there, sometime if you get a chance and you want to stop up for coffee, we'll go out and I'll tell you what really happened." (Tr. 89).

Duerr acknowledged, "I have no clue as to what the guy's name was, what ultimately he was referring to, .  .  ." but "[i]t's stuff like that I think about when I write this letter. There may be nothing there. This may be some individual making a comment." (Tr. 89-90).

6

With reference to Inspector Long, Duerr stated

> Truthfully, I don't remember if Joe actually told me whether he had concerns directly, but he's told other people and I did have a conversation with him and I can't remember – you know, he didn't come right out to my recollection and say, I have a concern, but the way he was expression himself, it sounded like he did.

(Tr. 81-82).

Inspector Long, Duerr also stated, "has kind of gone back and forth with anybody he's talked to. . . . One minute he'll have issues and the next minute he's not sure if the right guy is being executed. The bottom line is he's – there were concerns expressed at some point by him." (Tr. 92).

As to the others, Inspector Duerr testified:

> I've talked to all of them. And as I made it clear in previous interviews, none of them, with the exception of Danny, says that he felt it was two other individuals, and mind you that's my recollection of what he told me. None of them gave me any indication that Paul did anything wrong in that investigation.
> What they were expressing is reading the articles and knowing Paul, they had concerns about Mr. Spirko being executed.

(Tr. 91).

When asked by petitioner's counsel, "they didn't express to you that they had any personal knowledge of anything that Mr. Hartman may have done improperly," Duerr answered, "That's correct." (*Id.*).

On cross-examination by respondent's counsel, Inspector Duerr acknowledged that his statements in his letters to Governor Taft and Chief Inspector Heath were based on what he had read in the newspapers and "my experience with Paul Hartman," rather than on any personal involvement in the investigation of the Elgin, Ohio, robbery. (Tr. 105).

When asked about other sources for the beliefs expressed in his letters, Inspector Duerr admitted that he had not "examined or looked at the record of the evidence . . . against Mr.

7

Spirko" or read Hartman's testimony at the trial or been aware that petitioner had testified. (Tr. 106). He did not know the "number of appeals that Mr. Spirko has presented" (Tr. 109) or "the number of judges that have looked at his case on appeal." (Tr. 110).

Although Inspector Duerr acknowledged that he knew that the petitioner had confessed to the crime (Tr. 138-39), he was not aware that petitioner had told the investigators that he had tackled and held Mrs. Mottinger while she was stabbed by his accomplice, confessed to other Postal Inspectors (and not to Inspector Hartman alone), acknowledged those confessions on the witness stand, told the investigators in a recorded interview that he "was the man you're looking for", sent an inculpatory letter to his girlfriend and acknowledged doing so at his trial, and been the source for the name of his putative accomplice, Delany Gibson, and his alleged involvement in the crime. (Tr. 138-42).

Thus, according to Duerr, "anything I know comes from the newspaper relative to the Spirko case," (Tr. 106), so that "based what I read in the articles, it appears that [Hartman] possibly lied or there were things that were omitted." (Tr. 107). In his view, if the Cleveland Plain Dealer articles "are even remotely close, that, coupled with my experience, what I've been told by other inspectors, I have my doubts as to whether Paul was truthful" in his testimony at the Spirko trial. (Tr. 60). What he had seen in "the articles and my knowledge of Paul Hartman made me believe that there's a possibility that he lied." (Tr. 110).[3]

On at least one occasion, Duerr directly asked Postal Service officials whether the Service was doing all it could to resolve any doubts about petitioner's guilt. After Duerr did so, he was

---

[3] The *Plain Dealer* articles were the impetus for the petitioner's Rule 60(b) motion and its allegations of fraud on the part of the respondent.

ordered to meet the next day with Inspector in Charge Cottrell in Pittsburgh. Inspector Cottrell informed Duerr that he was being reassigned from Canton to Cleveland, and from the fraud unit to the external crimes unit.

In addition, once the Postal Service learned about his letters, Duerr was questioned by other supervisors about the letters and the claims made in them.

Duerr views these acts as retaliatory; petitioner contends that they were intended to keep other Postal Service employees from speaking about his case and any concerns they may have about the investigation, prosecution, and conviction.[4]

### b. January 3, 2000, Meeting and Subsequent Inquiry and Affidavit Filed by U.S. Postal Service

The October 17, 2005, order to the Postal Service to produce records sought, in part, information about the January 3, 2000, meeting between nine Postal Inspectors and supervisors.

That meeting resulted from substantial discontent on the part of several Postal Inspectors with Hartman's performance as a supervisor. As Duerr recalled the meeting in his deposition, "that meeting was primarily, the things that were raised were of racial harassment, maybe some sexual harassment, and there may have been some other stuff." (Tr. 66). For his own part, though he did not remember specifically what he had said at that meeting, it appears that Duerr focused on the

---

[4]

Though the Postal Service may have been indiscreet in its response to Duerr's letters and questions about petitioner's guilt, I do not find that it acted in a retaliatory manner, or that its response affected Duerr's ability and willingness to testify truthfully and fully.

Duerr's testimony convincingly and unequivocally shows that neither he nor his colleagues has or have any special, previously undisclosed information bearing either on Hartman's veracity or petitioner's conviction, much less on the question of whether a fraud was committed on this court during my consideration of the habeas petition.

friction in his relationship with Hartman during the year (1993-94) that Hartman was his supervisor. (*See* Tr. 68).

After the meeting, the Postal Service conducted several interviews. The records of those interviews are included in the materials reviewed *in camera*.

There is nothing in those interviews that relates to the Spirko investigation, prosecution, or conviction. The complaints about Hartman, though manifold, related to his alleged harassment of subordinates, frequent use of crude language and offensive gestures indicative of sexual acts and racial bias, statements reflective of racial and gender bias, and work habits. In addition, some Inspectors expressed concerns about Hartman's potential for violence, including statements attributed to him about shooting someone.

The interviews also referenced rumors about a sexual relationship with an Assistant U.S. Attorney.[5]

Not all interviewees concurred in the complaints about Hartman's conduct and attitudes.

After the interviews with the complaining Inspectors were completed, Hartman was interviewed. He denied the allegations made against him. He stated, however, that, in view of the

---

[5] With regard to the suggestion that there had been a complaint from the U.S. Attorney's office about such a relationship, Duerr had testified:

> I can't speak for a fact on it, but an incident with somebody at the U.S. Attorney's Office, they may have complained to our agency about him. . . .
> [It was some] relationship Paul had with an assistant over there, and some situation where they weren't happy with what they saw with the relationship going on in the office, a personal relationship taking place in the office. I don't know any particulars of it. I'm hearing that who knows how many times removed. It's something I heard.

(Tr. 97).

allegations against him, he could no longer serve effectively as a Supervisor, and that he would resign effective March 1, 2000, rather than in June, 2000, as he had previously intended.

In an affidavit accompanying the documents produced in response to the October 17, 2005, order, the Deputy Counsel for the U.S. Postal Inspection Service, Office of Counsel, states that the interviews following the January 3, 2000, meeting were not part of an investigation, and Hartman was not forced out of his position.

That affidavit also stated that no complaint or communication was found relative to a communication from the U.S. Attorney's Office concerning an alleged improper relationship between Inspector Paul Hartman and a female AUSA.

The affidavit also states that "there were no records whatsoever of any discipline issued to Inspector Paul Hartman." There was, though a record of an investigation following Hartman's shooting of a suspect on May 7, 1993.

## 2. Discovery Sought by Petitioner

On the basis of the Inspector Duerr's letters, the petitioner demanded extensive discovery to ascertain whether Inspector Hartman, contrary to his assertion that he was never the subject of a "complaint," was the subject of disciplinary proceedings during his career.

The "first stage" of this requested discovery includes:

- all documents concerning or relating to (a) any investigation of Paul Hartman, including, but not limited to, the 2000 investigation of Hartman referred to in Mr. Duerr's letter, including all of the complaint s that were filed; (b) Mr. Duerr's statement that "most if not all inspectors in Cleveland have concerns about what is transpiring" (referring to the pending execution of John Spirko); (c) Mr. Duerr's statements concerning Guy Cotrell and his threats to Mr. Duerr; (d) any other alleged improper conduct by Inspector Hartman; (e) any information shared by the U.S. Postal Inspection Service with the State concerning or relating to Inspector Duerr, Inspector Hartman, or the Mottinger case; (f) a Memorandum of Interview dated September 12,

11

    2005; and (g) a Letter from Elvin J. Crespo to Timothy Prichard dated September 14, 2005.

- the names and, if no longer employed by the U.S. Postal Inspection Service, current contact information of (a) the inspectors who have filed complaints concerning Inspector Hartman and/or expressed any concerns about the Mottinger case, and (b) any other inspector with knowledge of any alleged improper conduct by Inspector Hartman.

(Doc. 233 at 5-6).

In addition, the petitioner sought to depose all Inspectors with knowledge of Hartman's alleged misconduct. (Doc. 235 at 9). Petitioner reserves the right to conduct "third stage" discovery depending on what the documents and depositions may reveal.

I conclude that the discovery sought should not be allowed and, further, that there is no basis for re-opening the Rule 60(b) proceedings or vacating my order denying Rule 60(b) relief.

The premise for the instant request and proceeding is that Hartman lied when he stated that he had never been the subject of a "complaint," though he had been subjected to an Internal Affairs investigation after the 1993 shooting.

The Duerr deposition does not, contrary to petitioner's contention, justify a finding that Hartman's answer was false. The reference in Hartman's deposition to a "complaint" is fundamentally ambiguous. It is clear from Hartman's response that he believed he was being asked whether he had been the subject of a formal agency complaint. Nothing in the Duerr letters or deposition or material submitted by the Postal Service indicates that Hartman gave a false answer, much less a deliberately false answer, to that question when it is viewed, as it reasonably could and would be, in that manner.

The meeting of January 3, 2000, which had nothing, in any event, to do with Hartman's investigation of the Mottinger killing, did not involve a "complaint." The allegations about

12

Hartman's lack of professionalism, though numerous, varied, and extensive (though not universal on the part of all the Inspectors whom he had supervised) could properly be viewed by him as not constituting a complaint as that term was used in his deposition.

There is no basis or justification for allowing further discovery, or contemplating vacating my denial of the petitioner's Rule 60(b) motion, or otherwise reconsidering my conclusion that the petitioner has failed to show that consideration of his habeas corpus proceeding was tainted by fraud.

## Conclusion

It is, therefore,

ORDERED THAT the Motion for Leave to Conduct Supplemental Discovery (Doc. 233) be and the same hereby is denied.

An appeal from this decision should be allowed *in forma pauperis* and the Court certifies that an appeal from this decision could be taken in good faith, and the court hereby issues a certificate of appealability pursuant to 28 U.S.C. 2253(c ); Fed. R. App. P. 22(b).

So ordered.

                                                             <u>s/James G. Carr</u>
                                                             James G. Carr
                                                             Chief Judge